# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**HENRY M. GREEN**
         **Plaintiff,**

    **v.**                                 **Case No. 21-C-678**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**
         **Defendant.**

---

## DECISION AND ORDER

Plaintiff Henry Green applied for social security disability benefits, alleging that he could no longer work due to depression and a seizure disorder. The Administrative Law Judge ("ALJ") assigned to the case concluded that, despite these severe impairments, plaintiff could perform simple, routine work not exposing him to heights or hazards. After the Appeals Council denied review (Tr. at 1), the ALJ's decision became the final decision of the Commissioner of Social Security on plaintiff's application. See Poole v. Kijakazi, 28 F.4th 792, 794 (7th Cir. 2022).

Plaintiff now seeks judicial review, arguing that the ALJ failed to account for his deficits in concentration, persistence and pace ("CPP"), and erroneously discounted the opinion of an examining psychological consultant suggesting greater mental limitations. He further contends that the statute limiting the President's authority to remove the Commissioner from office, 42 U.S.C. § 902(a)(3), violates the separation of powers. For the reasons that follow, I reject these arguments and affirm the ALJ's decision.

# I. STANDARDS OF REVIEW

The ALJ applies a five-step, sequential test in determining whether a claimant is disabled.

> Step 1 asks whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). If no, then the ALJ moves to Step 2, which addresses the question whether the claimant has a medically determinable impairment, or a series of impairments, that are severe. 20 C.F.R. § 404.1520(c). If yes, then the question at Step 3 is whether that impairment appears on a list that the agency keeps, pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment appears on the list, then benefits are due. If not, the ALJ pauses to determine the claimant's residual functional capacity (RFC), defined as the most physical and mental work the claimant can do on a sustained basis despite her limitations. 20 C.F.R. § 404.1545(a). The RFC drives the determinations at Steps 4 and 5. At Step 4, the ALJ must see if the claimant is still capable of performing her past relevant work, given her RFC. If yes, then benefits must be denied. If no, the ALJ proceeds to the final step and determines, usually with the help of a vocational expert, whether there is any work in the national economy she can perform. Again, if yes, then the ALJ will deny the application; if no, the claimant prevails. For purposes of Steps 1 to 4, the claimant bears the burden of proof; only at Step 5 does it shift to the agency.

Mandrell v. Kijakazi, 25 F.4th 514, 516 (7th Cir. 2022).

The reviewing court will affirm an ALJ's decision to deny disability benefits if the ALJ followed applicable law and supported his conclusions with "substantial evidence." Grotts v. Kijakazi, 27 F.4th 1273, 1276 (7th Cir. 2022). Substantial evidence is not a high threshold: it means nothing more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The reviewing court will not re-weigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute its judgment for the ALJ's. Reynolds v. Kijakazi, 25 F.4th 470, 473 (7th Cir. 2022). Rather, the court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions. Id. The court reviews legal issues de novo. Poole, 28 F.4th at 794.

2

## II. FACTS AND BACKGROUND

**A.    Plaintiff's Application and Accompanying Reports**

Plaintiff applied for benefits in October 2019, alleging a disability onset date of March 31, 2018, when he was 31 years old.  (Tr. at 61, 215.)  He alleged that he could no longer work due to epilepsy/seizures, depression, and problems sleeping.  (Tr. at 235.)

In a November 2019 function report, plaintiff wrote that he had seizures, was depressed, had trouble getting out of bed, cried a lot, and felt stressed a lot.  (Tr. at 242.)  He reported that he needed help from his family with personal care and reminders to take medications and make appointments; his mother and brother prepared his meals and encouraged him to complete house and yard work.  (Tr. at 243-44.)  He reported that he had no hobbies; he used to be very active but now did not do anything.  He used to play sports but no longer did due to fear of seizures.  He spent time with his mother and brother watching television and did not go anywhere on a regular basis.  (Tr. at 246.)  He did not like being around a lot of people.  He checked that his impairments affected talking, memory, completing tasks, concentration, understanding, following instructions, and getting along with others.  He wrote that depression affected his concentration, and his seizures affected memory, understanding, following instructions, and completing tasks.  When he got depressed, he did not want to talk and found it hard to get along with others.  He indicated he could pay attention for five minutes, did not finish what he started, and found it hard to follow written instructions; he followed spoken instructions OK.  (Tr. at 247.)  He reported that he got along with authority figures OK and had never been fired from a job because of problems getting along with others.  He did not handle stress or changes in routine well.  (Tr. at 248.)

3

**B.    Medical Evidence**

The agency collected plaintiff's medical records, dating back about two years from the application date.  On August 5, 2017, plaintiff was seen for neck and shoulder pain following a car accident.  (Tr. at 312.)  Providers assessed a left shoulder strain, recommending Ibuprofen, rest, ice, and heat.  (Tr. at 313.)  Cervical x-rays showed no fractures or significant soft tissue swelling (Tr. at 367), and x-rays of the left shoulder showed no fracture or dislocation (Tr. at 369).

On August 9, 2018, plaintiff went to the St. Joseph's Hospital emergency room after experiencing a seizure.  He had not been taking Keppra, his prescribed anticonvulsant medication.  He reported that his last seizure was in November 2017.  Providers gave him Keppra (Tr. at 390), advised that it was illegal for him to drive, and instructed him to follow up with his primary doctor (Tr. at 398).

On August 29, 2018, plaintiff returned to the St. Joseph's ER seeking a refill of Keppra. He was scheduled to see his primary doctor the next day.  He did not have a neurologist at that time.  (Tr. at 394.)

On August 30, 2018, plaintiff established care with Dr. Savan Panchal.  (Tr. at 320.)  He had been out of his seizure medication for awhile; he went to the ER and received a one month supply. He also needed to follow up with neurology. His seizures had been under control since starting on Keppra.  (Tr. at 322.)  Dr. Panchal assessed seizure disorder, stable, and prescribed Keppra.  He advised plaintiff that he needed to have routine follow up with neurology; plaintiff also needed to be seizure free and compliant with medications for three months to be cleared for driving.  (Tr. at 324.)

On September 11, 2018, plaintiff saw Dr. Robert Goldman, a neurologist, on referral

4

from Dr. Panchal. Plaintiff reported experiencing about five to six seizures, the first when he was in college in 2007, averaging about one seizure every two years or so. His seizures occurred without warning; he blacked out, lost consciousness, then woke up feeling weak, dizzy, and confused. His most recent seizure was on August 9, 2018; he was not taking anticonvulsant medications at that time. (Tr. at 329.) He had been provided Keppra, which he was tolerating reasonably well, although he had some concerns about taking the medication. (Tr. at 329-30.) He had been seen by neurologists in the past, treated with anticonvulsants. Review of systems showed no major concerns with sleep, depression, or anxiety. (Tr. at 330.) On exam, he was alert and attentive, pleasant and cooperative, relating a clear and coherent history. Exam was otherwise unremarkable. Dr. Goldman assessed epilepsy, recurrent seizures off medication, and nonfocal neurological exam. (Tr. at 331.) Dr. Goldman reviewed driving restrictions (no driving for a minimum of three months) and common sense precautions to limit otherwise potentially dangerous activity. Dr. Goldman continued plaintiff on Keppra, with a potential increase in the future depending on how he did. (Tr. at 332.)

Plaintiff returned to Dr. Goldman on November 21, 2018, indicating he was doing okay, with no subsequent seizures. He worked as a substitute teacher but had only returned to work on two days since September. He reported feeling tired, with trouble getting up. "When I asked him, he said he may feel a little bit sad, he is really unclear about depression." (Tr. at 336.) On exam, he was alert and attentive, with fluent language, and appropriate affect. Dr. Goldman assessed epilepsy, multiple recurrent seizures off medication, and lack of ambition, not returning to work. "We reviewed concerns regarding depression, lack of ambition[.] I suggested referral to Behavioral Health for counseling[.]" (Tr. at 336.) Plaintiff agreed, and Dr. Goldman made the referral. "I did indicate the goal of therapy for epilepsy is treatment without

5

seizures and the patient should be able to return to normal activities." (Tr. at 336-37.) Dr. Goldman continued Keppra, as he did "not get a clearcut history that medication is responsible for behavioral change." (Tr. at 337.) Dr. Goldman also encouraged plaintiff to try to be more active. (Tr. at 337.)

On February 13, 2019, plaintiff saw Carol Brown, Ph.D., for a behavioral health initial assessment, presenting with concerns of depressed mood and increased anxiety that developed after the seizure last August. (Tr. at 370.) He had initially been diagnosed with epilepsy in 2007, but he stated the seizures were smaller and less impactful; the seizure that occurred last fall was different and had a very negative impact on him. He had stopped working due to fears of another seizure. (Tr. at 377.) He reported feeling sad, helpless and worthless, with social withdrawal, irritability, mood swings, and anxiety. He rated his energy and concentration as fair. (Tr. at 378.) On mental status exam, he displayed unremarkable appearance, moderate distress, and normal gait and posture; he maintained eye contact, with unremarkable mannerisms, normal behavior, depressed mood, normal affect, congruent thought process, normal thought content, no perceptual problems, normal orientation, clear speech, fair insight and judgment, and good memory, concentration and attention. (Tr. at 380.) Dr. Brown diagnosed depression secondary to medical condition (epilepsy) and adjustment disorder with anxious mood, recommending a higher level of care and medication assessment. (Tr. at 380-81.) Plaintiff indicated he was open to individual therapy but asked for more time to consider intensive treatment and medication assessment services. He was scheduled for a follow up on February 27, 2019. (Tr at 382.)

On February 27, 2019, plaintiff reported that his mood had improved and his anxiety decreased. He did not want to complete an intensive out-patient program because he wanted

6

to focus on spending time with his children and looking for a job. Dr. Brown noted that plaintiff was on time and engaged in the session, with improved mood; thoughts were future-oriented and more positive. Speech was normal rate and volume. He participated in goal setting but refused a higher level of care and a medication assessment. He planned to talk to his primary doctor and neurologist about his concerns. (Tr. at 384.) Plaintiff did not return thereafter, and Dr. Brown discharged him from care. (Tr. at 383.)

On July 16, 2019, plaintiff saw Dr. Panchal for a routine physical. (Tr. at 341-42, 346-47.) He denied any seizures while on Keppra but reported not feeling well since taking the medication; "also states he can't work because of this – has court date coming up for child support." (Tr. at 347.) On review of systems, Dr. Panchal noted no disorder of thought or mood. (Tr. at 349.) On exam, plaintiff was alert and oriented; neurological exam was nonfocal. (Tr. at 350.) Dr. Panchal continued Keppra and recommended plaintiff set up with neurology (Tr at 351), as he had not gone to his last appointment (Tr. at 347). Dr. Panchal further stated: "Discussed clearly with pt that no medical reasoning/physical exam findings/restrictions for me to write any letter stating on why he can not work." (Tr. at 351.)

On September 18, 2019, plaintiff returned to Dr. Goldman for neurological reevaluation, regarding concerns with seizure disorder, previous noncompliance, lack of ambition, and not returning to work. He had last been seen in November 2018, with a referral made to Behavioral Health due to concerns with depression. He was seen on two occasions, recommended for further therapy, but he did not follow through. He continued on Keppra, with no further seizures, but he was not working. "He is not feeling so well. It is hard to get up in the morning." (Tr. at 356.) "He has to go to court next month and explain why he is not working. He says he is not able to go back to the same job, does not feel the same. He has some memory issues

7

and occasional blurry vision.  The patient does think he is depressed.  He has some dizziness, fatigue."  (Tr. at 356.)  On exam, plaintiff was alert and attentive, pleasant and cooperative, with fluent language, appropriate affect, and intact gait and coordination.  (Tr. at 356-57.)  Dr. Goldman assessed epilepsy, recurrent seizures when noncompliant with anti-epileptic medication; lack of ambition, difficulty returning to work; and depression.  Dr. Goldman suggested a trial of switching medications to see if the Keppra may be contributing to his lack of ambition and depression.  Plaintiff agreed to transition to Dilantin.  (Tr. at 357.)  "We discussed if there does not seem to be a significant change in mood and ambition with change in anticonvulsant, then we would conclude the anticonvulsant is not playing a role.  This may take at least a month or so on the new medication, however.  If there is no improvement with change, then I think the next step would be treatment with [an] antidepressant."  (Tr. at 357-58.)

On October 10, 2019, plaintiff established care with Dr. John Wall (internal medicine), reporting a history of seizures starting in 2007, the last a year ago.  "He was a substitute teacher but stopped because of the seizure. . . . He did see a psychologist for a few sessions after his last seizure since he was feeling depressed."  (Tr. at 421.)  Dr. Wall assessed a seizure disorder, noting:  "He has a history of seizures and is taking dilantin, his last seizure was a year ago.  He was working as a substitute teacher when he had his last seizure."  (Tr. at 424.)  Dr. Wall further assessed depression, chronic, noting: "Patient has [been] feeling depressed with the last several years since he has a seizure disorder and has [been] unable to work.  He is taking sertraline which is somewhat effective but he would like to see a psychiatrist."  (Tr. at 424.)

On October 10, 2019, Dr. Wall wrote a "To Whom It May Concern" letter indicating: "[Plaintiff] is a patient of mine.  He has a diagnosis of epilepsy and chronic depression.  He is

8

unable to do any type of work indefinitely." (Tr. at 302.)

On October 23, 2019, plaintiff returned to Dr. Goldman, who noted: "In terms of the depression, the patient returns and essentially no difference, so it seems the depression is not a side effect of [Keppra]." (Tr. at 362.) Plaintiff reported tolerating the Dilantin reasonably well, noting it may make him a little tired. (Tr. at 362.) His last seizure was in August 2018. He continued taking Sertraline and did not know if it was helpful. He "continues to be depressed. It is difficult for him to accomplish everyday tasks. He has low energy. He is applying for disability." (Tr. at 363.) Neurological exam was unremarkable. Dr. Goldman assessed history of seizure disturbance, depression, no motivation, and difficulty returning to work. (Tr. at 363.) They discussed going back to Keppra, but plaintiff preferred to stay on Dilantin; Dr. Goldman increased the dose. (Tr. at 363-64.) "I did indicate the patient needs to get out and be more active and he needs to make a concerted effort in this regard." (Tr. at 364.) Dr. Goldman also strongly urged plaintiff to reconnect with Behavioral Health. (Tr. at 364.)

On October 23, 2019, Dr. Goldman wrote a letter, stating: "[Plaintiff] is followed in neurology clinic for concerns with history of seizures, as well as depression. These medical concerns are currently interfering with his ability to work." (Tr. at 304.)

On November 4, 2019, plaintiff saw Dr. Wall, who noted that "he is applying for disability since he cannot work with his seizures and depression." (Tr. at 417.) On exam, Dr. Wall noted that plaintiff appeared depressed and anxious. Regarding plaintiff's seizure disorder, Dr. Wall noted: "He has a neurologist and his dilantin has [been] increased. No recent seizures but he says that before he goes to sleep he has [been] getting some tremors, is going to mention it to his neurologist." (Tr. at 420.) Regarding depression, Dr. Wall noted: "[Plaintiff] continues to feel down, he finished his degree in criminal justice and was working until his seizures

9

became worse.  He has two children, good social support.  Gave letter to call to set up an appointment to see his psychologist.  He is taking the sertraline daily." (Tr. at 420.)

On December 19, 2019, plaintiff returned to Dr. Goldman, reporting no further seizures although he occasionally shook while sleeping.  He continued on Sertraline and Dilantin.  He did not think the Sertraline had been that helpful, as he was still somewhat depressed.  "He is having some court issues.  He has not returned to work.  He does not know what he is capable of." (Tr. at 459.)  On exam, plaintiff was alert and attentive, and appeared to be in good spirits, with appropriate affect.  He had been seen by behavioral health for adjustment disorder with anxiety, and they had suggested follow up plans.  (Tr. at 459.)  Dr. Goldman increased Sertraline and emphasized the importance of continued behavioral health services.  Dr. Goldman also "indicated that most people with seizures are able to go back to work, have families and have relatively normal lives.  I did give him a letter for court indicating he should be going back to work 1 day a week and that this should be progressively increased." (Tr. at 460.)

On January 18, 2020, plaintiff went to the St. Joseph's Hospital ER after a car accident, complaining of neck and back pain.  (Tr. at 430.)  Neurological and psychiatric exams were normal.    (Tr. at 432.)    Providers diagnosed muscle strain and prescribed Flexeril (cyclobenzaprine) and Naproxen.  (Tr. at 434.)  On January 22, plaintiff saw Dr. Wall for follow up after the accident.  (Tr. at 546.)  Dr. Wall ordered x-rays and made a referral to physical therapy.  (Tr. at 549-50.)  The x-rays suggested muscle spasm.  (Tr. at 551.)  On January 28, plaintiff saw Dr. Wall for refills of Naproxen and cyclobenzaprine.  He had been referred to physical therapy but had not started yet.  (Tr. at 542.)  Dr. Wall refilled the medications and made another referral to physical therapy.  (Tr. at 544.)  Plaintiff thereafter received physical

10

therapy, moving to a home exercise program due to the pandemic (Tr. at 442-59, 480), later resuming therapy (Tr. at 470-74, 475-77, 495-514, 564-81).

On February 27, 2020, plaintiff saw Dr. Wall for follow up after the accident, complaining of neck pain. (Tr. at 536.) On exam, he displayed mild pain on palpation of the cervical and lumbar areas, decreased neck range of motion, and depressed affect. Dr. Wall assessed neck pain, going to physical therapy, still with difficulty moving his neck. He continued on medications including acetaminophen and Naproxen. He also had chronic depression, going to Renew Counseling, and took Sertraline. He also continued on Dilantin, with no seizures for three years. (Tr. at 539.)

On March 18, 2020, plaintiff's behavioral health counselor, Vanessa Minor, suspended in person counseling due to the pandemic. (Tr. at 443.) On April 21, 2020, plaintiff had a telephone visit with Dr. Goldman, noting no further seizures. He continued on medications, tolerating them without difficulty. "He is still having issues returning to work. He requests a letter regarding this for some court-related issues, which I will provide. I did let him know that patients with seizure disturbance often are able to return to work and lead productive lives, particularly if the seizures are well controlled." (Tr. at 479.) Dr. Goldman continued Dilantin and Sertraline and "[e]ncouraged him to try to get back to work in some capacity." (Tr. at 479.)

On May 1, 2020, plaintiff saw Dr. Wall for lower back and neck pain, and seizure follow up. (Tr. at 531.) On exam, he displayed pain on palpation of the cervical and paraspinal muscles and depressed affect; neurologic exam was normal. Dr. Wall assessed depression, chronic, noting plaintiff was seeing mental health for tele-visits. (Tr. at 534.) He continued on Sertraline and Dilantin, with no recent seizures. Dr. Wall also continued medications for chronic neck pain. (Tr. at 534.)

11

During a May 18, 2020, telephone session with therapist Minor, plaintiff said, "I've been taking it day by day." He had been focusing on spending more time with his son. He also reported sleeping more than usual and having trouble getting his day started. The sleep disruption caused him to feel more grouchy than usual. Plaintiff was open and talkative throughout the session; he appeared engaged and receptive to feedback. (Tr. at 478.) Minor listed a diagnosis of adjustment disorder with anxiety. Plaintiff did not answer when Minor called for a telephone session on May 28, 2020. (Tr. at 477.)

On June 1, 2020, plaintiff called Dr. Goldman's office seeking a letter for his disability hearing regarding his physical limitations and ability to work. (Tr. at 474.)

On June 29, 2020, plaintiff followed up with Dr. Wall regarding neck and back pain. (Tr. at 526.) On exam, he displayed moderate pain on palpation of the lumbar paraspinal muscles. He also appeared anxious. Plaintiff reported that the physical therapy had helped his neck and low back pain, although he continued to experience some decreased range of motion and periodic pain. He continued to feel depressed but was going to behavioral health, which helped. He continued to take Sertraline. He wanted a second opinion regarding his seizures and how they affected his ability to work. He continued on Dilantin. (Tr. at 529.) Dr. Wall made a referral to neurology. (Tr. at 530.)

On July 15, 2020, plaintiff saw Dr. Rizwanullah Arain for a neurology consultation. He reported experiencing his first seizure around 2005 while in college in Tennessee. His next was four to five years later, in Milwaukee. He reported four to five seizures since 2009, the last about two years ago. He was initially started on Keppra but reported side effects, and Dr. Goldman switched him to phenytoin (Dilantin) about two years earlier. His last seizure was before he switched from Keppra due to side effects. However, since starting on phenytoin he

12

reported different side effects including weakness, sleepiness, poor memory, and mood swings. He started on Sertraline about one year earlier, but it did not make any difference. "One of his reasons for seeking another neurologist at this time is apparently because Dr. Goldman was not encouraging his desire to seek disability." (Tr. at 558.) On exam, he was alert and oriented, with fluent speech, normal comprehension, and no recent or remote memory deficit. Neurologic exam was normal. Dr. Arain assessed generalized convulsive epilepsy. (Tr. at 559.) "His seizures were well controlled on Keppra as well as phenytoin but he was switched from Keppra to phenytoin because of side effects, and now he is having side effects on phenytoin. Part of his reason for seeking disability is poor quality of life, mostly due to side effects. His last seizure was about two years ago." (Tr. at 559.) Dr. Arain switched plaintiff to lamotrigine (Lamictal) to see if they could control his seizures without the unpleasant side effects and discontinued Sertraline. (Tr. at 559-60.)

On August 13, 2020, plaintiff had a phone session with Minor. (Tr. at 488.) He reported: "I am feeling better than I was." (Tr. at 489.) He indicated that he had been found in contempt of his court order. He stated he had been trying to stay busy and had been spending time with his family. He was open and talkative, engaged and receptive to feedback. (Tr. at 489.)

On August 17, 2020, plaintiff followed up with Dr. Arain. He reported no seizures on lamotrigine; he had stopped phenytoin and Sertraline. He denied any side effects, other than mild diarrhea a couple says ago. (Tr. at 555.) On exam, he was alert and oriented, with fluent speech, normal comprehension, and no recent or remote memory deficit. Neurologic exam was normal. (Tr. at 556.) Dr. Arain assessed generalized convulsive epilepsy and increased the lamotrigine. (Tr. at 556-57.)

On August 31, 2020, plaintiff saw Dr. Wall regarding back and neck pain. (Tr. at 520.)

13

On exam, he displayed depressed affect and appeared anxious. Neurologic exam was normal. Dr. Wall noted plaintiff's last seizure was two years ago. He had seen a new neurologist, Dr. Arain, who switched him to lamotrigine for seizures and stopped the Sertraline. Plaintiff reported his mood had been more down since it was stopped. Dr. Wall referred him to a psychiatrist for further assessment and need for an antidepressant. (Tr. at 523.)

On September 1, 2020, plaintiff had a phone session with Minor. (Tr. at 484.) He again reported "taking it day by day." (Tr. at 485.) His mood had been stable. He recently started a new medication and was adjusting to it. He reported that his primary doctor had referred him to a psychiatrist for medication management due to concerns about anxiety. He stated that he didn't feel any different. "He reported he has been riding his bike and doing yard work. He reported he is waiting to find out the outcome for his SSI hearing." (Tr. at 485.) Minor recommended plaintiff consider how he might manage his mood during colder months when his normal coping methods might not be available. He was alert and oriented, motivated, and cooperative; mood appeared calm with congruent effect, normal speech, unremarkable motor activity, and thought process future oriented and goal directed. Minor diagnosed depressive disorder due to another medical condition with major depressive-life episode. (Tr. at 485.)

On September 21, 2020, plaintiff followed up with Dr. Arain, reporting no side effects from lamotrigine other than mild loss of appetite. (Tr. at 552.) On exam, he was alert and oriented, with fluent speech, normal comprehension, and no recent or remote memory deficit. Neurologic exam was normal. (Tr. at 553.) Dr. Arain assessed generalized convulsive epilepsy and continued lamotrigine. (Tr. at 553-54.)

On November 4, 2020, plaintiff returned to Dr. Wall for follow up of chronic lower back pain and seizures. (Tr. at 515.) On exam, he appeared in moderate pain/distress and anxious.

14

(Tr. at 517-18.) He had experienced no recent seizures but reported some occasional muscle twitching since taking lamotrigine. He was scheduled to see Dr. Arain later that month. He continued to have chronic depression, and Dr. Wall made a referral to behavioral health. (Tr. at 518.)

## C. Consultative Psychological Evaluation

The agency also sent plaintiff for a psychological evaluation with Mark Pushkash, Ph.D., on January 30, 2020. Plaintiff's chief complaint was: "I've had a lot of problems since my seizures started. I owe back child support because I can't work. I'm forgetful. My life has changed." (Tr. at 435.) He reported working as a substitute teacher for about four years but lost this job about two years earlier because of complications of seizures and depression. (Tr. at 435.) He was taking anti-seizure and antidepressant medications. (Tr. at 435-36.) He had seen a psychologist for a few sessions the previous year. He reported being depressed for about the last two years, ever since he lost his job. He did not report any symptoms of depression or anxiety prior to this. He believed medication had been somewhat helpful in improving his mood, but he remained depressed. (Tr. at 436.)

Plaintiff reported helping care for his son and also helping out an aunt. He had the skills to engage in all domestic chores such as meal preparation, cleaning, and laundry; he also followed through on basic daily activities independently, and no hygiene problems were noted during the exam. Socially, he stated that he had some friends and saw his mother, sister, and kids. He got along reasonably well with others but described himself as more frustrated and irritated than he used to be. (Tr. at 436.)

On mental status exam, plaintiff sat with a tense body posture, but his overall level of motor activity was within normal limits. Eye contact was good, and there was normal social

15

responsiveness. He was able to pay attention and there were no signs of distractibility or other symptoms of ADHD. Verbally, there were no problems with fluency of speech or articulation. He was able to relevantly and coherently respond to all questions without evidence for irrational thinking or paranoia. Emotionally, his affect was constricted and his mood depressed. He reported trouble sleeping and feeling tired all the time. He described himself as sad most of the time, indicating he had lost motivation and drive. He described a feeling of hopelessness but denied plan or intent to harm himself. (Tr. at 436.) Regarding anxiety, plaintiff stated that he worried about his health and finances. However, he did not endorse symptoms of generalized anxiety, posttraumatic stress disorder, or panic. The anxiety appeared to be associated with his depressive condition. (Tr. at 437.) Regarding sensorium and mental capacity, plaintiff was oriented to person, place, time, and circumstance. He was able to name the last six Presidents. On a digit span task, he was able to recall seven digits forward and four in reverse. On a technique of short-term memory, he was able to recall three unrelated items after a 10-minute delay. In the area of calculation, he computed 17x3 as 51 and was able to do serial 7s to 50 without error. He was also able to respond appropriately to questions assessing abstract reasoning. "In all, results of the cognitive measures were unremarkable." (Tr. at 437.)

Dr. Pushkash summarized:

[Plaintiff] is a 33-year-old man who describes significant changes in his life since the development of seizures about 13 years ago. Since then, he has lost his job as a teacher and has developed major depressive symptoms. Depressive symptoms include persistent sadness, insomnia, a loss of motivation/drive, appetite suppression, feelings of hopelessness, anxiety, and suicidal ideation. Cognitively, there does not appear to be evidence for significant impairment.

(Tr. at 437.) Dr. Pushkash diagnosed major depression, severe; seizure disorder; and

16

psychosocial stressors, including inadequate finances, loss of independence, and significant child support.  (Tr. at 437.)  Regarding work capacity, Dr. Pushkash concluded:

> This man has the intellectual capabilities to comprehend, recall and follow through on basic instructions; however, his ability to concentrate and persist on tasks in a work setting would be markedly impaired due to the interfering effects of depression and anxiety.  It is felt that this man might also have some difficulties relating appropriately to supervisors and coworkers, because he has a low tolerance for frustration and is easily irritated.  Coping skills are compromised by his seizure disorder and his depression.  It was recommended to the claimant that he continue to follow up with mental health treatment.  Finally, should this man be entitled to funding, it would appear that he could handle the money in his own best interests.

(Tr. at 437-38.)

## D.    Agency Decisions

The agency denied the application initially on February 6, 2020, based on the reviews of Catherine Bard, Psy.D., and Mina Khorshidi, M.D.  (Tr. at 93-94, 129.)  Dr. Bard evaluated plaintiff's mental impairments under Listings 12.04 (depressive disorders) and 12.15 (trauma related disorders), finding under the "paragraph B" criteria no limitation in understanding, remembering, or applying information; mild limitation in interacting with others; mild limitation in concentrating, persisting, or maintaining pace; and moderate limitation in adapting or managing oneself.  (Tr. at 67, 83.)  In a mental RFC report, Dr. Bard found no understanding and memory limitations, and no sustained concentration and persistence limitations. Regarding the latter conclusion, she explained: "Clmt would have breaks in his concentration, but would be able to reorient himself to complete assigned tasks within acceptable standards." (Tr. at 73, 89.)  Dr. Bard also found no social interaction limitations.  She did assess adaptation limitations, finding plaintiff moderately limited in the ability to respond appropriately to changes in the work setting and travel in unfamiliar places or use public transportation.  She explained:

17

"Clmt reports that he has difficulty coping w/ stress and adapting to change. In a work environment, clmt would do best in a position that does not require frequently changing tasks, but rather had a fairly regular set of duties and expectations." (Tr. at 73, 89.) Dr. Khorshidi opined that plaintiff could perform medium level work, frequently climb ladders/ropes/scaffolds, and needed to avoid concentrated exposure to hazards. (Tr. at 70-71.) Dr. Khorshidi explained that the limitations on climbing and hazards addressed the risk of fall and injury if plaintiff had a sudden onset of seizure. (Tr. at 71-72, 87.)

Plaintiff requested reconsideration (Tr. at 137), but on June 17, 2020, the agency maintained the denial based on the reviews of Jason Kocina, Psy.D., and Marc Young, M.D. (Tr. at 95-96, 138, 144.) Dr. Kocina evaluated plaintiff's mental impairments under Listings 12.04 (depressive disorders) and 12.06 (anxiety related disorders), finding under the "paragraph B" criteria no limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; no limitation in concentrating, persisting, or maintaining pace; and moderate limitation in adapting or managing oneself. (Tr. at 103, 119.) In his mental RFC report, Dr. Kocina found no understanding and memory limitations, explaining: "The claimant can understand, remember, and carry out simple instructions. His memory functioning is intact." (Tr. at 107, 123.) Dr. Kocina also found no sustained concentration and persistence limitations, explaining: "Clmt would have breaks in his concentration, but would be able to reorient himself to complete assigned tasks within acceptable standards." (Tr. at 108, 124.) Dr. Kocina found that plaintiff did have social interaction limitations, i.e., he was moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors, explaining: "The clmt would have some difficulty being around other people for extended periods of time due to [his] depression and

18

anxiety disorder [and] would do best in an environment with more limited social interactions."

(Tr. at 108, 124.) Finally, Dr. Kocina found adaptation limitations, i.e., plaintiff was moderately

limited in the ability to respond appropriately to changes in the work setting and set realistic

goals or make plans independently of others, explaining: "The clmt would be capable of setting

goals if the job expectations were simple and clearly understood." (Tr. at 108, 124.) Dr. Kocina

concluded: "Overall, evidence in file shows he remains capable of the basic mental demands

of unskilled work on a sustained basis." (Tr. at 125.) Dr. Young found no exertional limitation,

but like Dr. Khorshidi he limited plaintiff to frequent climbing of ladders/ropes/scaffolds and no

concentrated exposure to hazards due to the risk of injury from a seizure. (Tr. at 105-06, 121-

22.)

## E.     Hearing

Plaintiff requested a hearing before an ALJ (Tr. at 160), which was conducted

telephonically on January 5, 2021. The ALJ also called a vocational expert ("VE") for the

hearing. (Tr. at 37.)

### 1.     Plaintiff's Testimony

Plaintiff testified that he lived with his brother and had no source of income. (Tr. at 43.)

He had a driver's license but infrequently drove due to seizure concerns. (Tr. at 44.) He had

a college degree (Tr. at 44) and previously worked as a substitute teacher, teacher assistant,

and youth counselor (Tr. at 45). He stopped working due to seizures and depression. (Tr. at

47.) He was involved in court proceedings for child support for his son, which required him to

engage in job searches, although he had not been offered any jobs. (Tr. at 48.)

Plaintiff testified that he could not work due to headaches, mood swings, difficulty

remembering things, weakness, and not wanting to be around people. (Tr. at 49.) He indicated that his seizures started when he was in college; he last had one in 2018. His medication had somewhat kept his seizures in check, although his family advised him of episodes while he slept. His medications caused side effects of headaches, forgetfulness, fatigue, loss of appetite, depression, and mood swings. (Tr. at 50.)

Plaintiff testified that he also took medication for depression. The depression caused mood swings and difficulty concentrating and remembering things. (Tr. at 52.) The depression started after his first seizure. (Tr. at 53.) Plaintiff indicated that he had little desire to engage in activities. He socialized with immediate family only. (Tr. at 53.)

### 2. VE's Testimony

The VE classified plaintiff's past work as a teacher as skilled and light, and as an aide as light and skilled. (Tr. at 55.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and experience; limited to light work; could never climb ladders, ropes, or scaffolds; could never be exposed to workplace hazards such as moving mechanical parts and unprotected heights; could not operate a motor vehicle as part of a job; would be limited to simple, routine, repetitive tasks; limited to jobs involving simple decision making and no more than occasional changes; and limited to no more than occasional interaction with supervisors, coworkers, and the public. (Tr. at 55-56.) The VE testified that such a person could not perform plaintiff's past work but could do other jobs, such as food preparation, dishwasher, and vehicle cleaner. (Tr. at 56.) If the person would be off task in excess of 15% of a normal workday and/or would be absent from work two or more time per month on an ongoing basis, all jobs would be eliminated. (Tr. at 57.)

## F.    ALJ's Decision

On January 15, 2021, the ALJ issued an unfavorable decision.  (Tr. at 16.)  At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since March 31, 2018, the alleged onset date.  (Tr. at 21.)  At step two, the ALJ found that plaintiff suffered from the severe impairments of seizure disorder, depressive disorder, and anxiety disorder.  The ALJ determined that the injuries plaintiff sustained in the January 2020 car accident did not rise to the level of a severe medically determinable impairment.  (Tr. at 22.)

At step three, the ALJ found that plaintiff's severe impairments did not meet or equal a Listing.  The record did not document seizure activity with the frequency required to meet Listing 11.02: plaintiff's last seizure occurred on August 9, 2018, and his seizure disorder had been well controlled on medication since that time.  (Tr. at 22.)

The ALJ further found that plaintiff's mental impairments did not meet Listings 12.04 and 12.06.  Those provisions are satisfied if the impairment results in one "extreme" or two "marked" limitations under the "paragraph B" criteria:  understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (Tr. at 22.)

The ALJ found mild limitation in understanding, remembering, or applying information.  Plaintiff alleged disability in part due to depression.  In November 2019, he reported that his depression affected his memory, as well as his ability to understand and follow instructions.  He further reported difficulty concentrating on written instructions, but that he could follow spoken instructions okay.  (Tr. at 22.)  During the January 2020 exam with Dr. Pushkash, plaintiff's performance on cognitive testing was unremarkable, and he performed adequately on memory testing.  (Tr. at 22-23.)  Dr. Pushkash concluded that plaintiff had the intellectual

21

capacities to comprehend, recall, and follow through on basic instructions. The reviewing agency psychological consultants found no limitation in this area. The ALJ found their opinions persuasive but concluded that plaintiff's depressive symptoms could be expected to cause mild limitation in this area of functioning. (Tr. at 23.)

In interacting with others, the ALJ found moderate limitation. Plaintiff reported difficulty getting along with others but no significant trouble with authority figures. He reported spending time watching television with his mother and brother on a regular basis; otherwise, he did not participate in social activities and did not want to talk to others. At the consultative exam, plaintiff made good eye contact and demonstrated social responsiveness, with no evidence of paranoia. He did display a depressed mood, constricted affect, and tense body posture, and he reported low tolerance for frustration and being easily irritated. Plaintiff had received limited mental health treatment, but his providers noted cooperative behavior during sessions. In May 2020, he was open and talkative throughout the session, and he appeared engaged and receptive to the therapist's feedback. Dr. Pushkash concluded that plaintiff might have some difficulties relating appropriately to supervisors and coworkers, but nothing in the doctor's evaluation supported a finding of marked limitation. The initial agency consultant found only a mild limitation in this area. However, the reconsideration level consultant found a moderate limitation, and the ALJ found this opinion persuasive. (Tr. at 23.)

The ALJ found a moderate limitation in concentrating, persisting, or maintaining pace. Plaintiff reported that he had trouble sleeping, and that he needed encouragement from his family to complete household chores. He further reported that he was once very active but did not do anything anymore and that his depression made it difficult to concentrate. He also advised treating providers that he experienced low energy and low motivation. However, at the

22

January 2020 consultative exam, he demonstrated normal motor activity and performed well on tasks of concentration. Dr. Pushkash concluded that plaintiff would have a marked impairment in his ability to concentrate and persist on tasks in a work setting, but the ALJ found this conclusion was not supported by the doctor's exam findings. The agency reviewing consultants found no more than mild limitations, but the ALJ concluded that plaintiff's depression and anxiety symptoms could reasonably be expected to cause moderate limitations in this area of functioning. (Tr. at 23.)

As for adapting or managing oneself, the ALJ found moderate limitation. Plaintiff reported in November 2019 that he sometimes needed assistance with bathing and dressing, and that he required reminders to take his medications and attend his doctor's appointments. (Tr. at 23.) He further reported that he needed encouragement from his family to mow the lawn, and that his mother and brother did all food preparation. (Tr. at 23-24.) Plaintiff also reported that he used to play sports, but he now had no interests and was afraid he would have a seizure. At the January 2020 consultative exam, plaintiff reported difficulty sleeping, was tired all the time, worried about the unpredictable nature of seizures, and had lost his motivation and drive. The agency psychological consultants found moderate limitation in this area, and the ALJ found these opinions persuasive. (Tr. at 24.)

The ALJ acknowledged that the paragraph B criteria are not an RFC assessment but rather are used to rate the severity of mental impairments at steps two and three of the sequential evaluation process. The mental RFC assessment used at steps four and five require a more detailed assessment of the areas of mental functioning. "The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (Tr. at 24.)

23

Prior to step four, the ALJ determined that plaintiff had the RFC to perform a full range of work at all exertional levels but with several non-exertional limitations: never climb ladders ropes, or scaffolds; never be exposed to hazards such as moving mechanical parts and unprotected heights, and never operate a motor vehicle as part of a job. The ALJ found that plaintiff was further limited to simple, routine, and repetitive tasks; jobs with simple decision making and no more than occasional changes; and occasional interaction with supervisors, coworkers, and the public. In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 24.)

At the time of decision, plaintiff was 34 years old. He alleged disability due to epilepsy, depression, and problems sleeping. In November 2019, he reported unpredictable seizures, sleeping a lot, crying, and trouble getting out of bed due to depression. He further reported feeling stressed out a lot and doing very little other than watching television with his mother and brother; he became agitated and did not want to be around other people. Finally, he reported that he did not handle stress or changes in routine well and that he was afraid of having additional seizures. The ALJ determined that while plaintiff's impairments could be reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical and other evidence of record. (Tr. at 25.)

The ALJ first reviewed the medical evidence. Plaintiff alleged disability beginning in March 2018, but the record did not document evidence of any significant treatment until August 9, 2018, when plaintiff went to the emergency room after having a seizure. At that time, plaintiff reported he was not taking Keppra, his prescribed anticonvulsant medication. Plaintiff was given Keppra and discharged with instructions to follow up with neurology. He returned to the

24

emergency room on August 29, 2018, to obtain refills of his Keppra, with no reports of additional seizure activity.  (Tr. at 25.)

Plaintiff established care with family practitioner Dr. Panchal on August 30, 2018.  Physical exam, including neurological findings, were all normal.  Dr. Panchal referred plaintiff to neurology, refilled his Keppra prescription, and instructed that he must be seizure-free and compliant with medication for three months before being cleared to drive.  (Tr. at 25.)

Since that time, plaintiff continued to follow with a neurologist and to take anticonvulsant medication, and the record documented no further seizure activity since August 9, 2018.  At a September 2018 neurological evaluation with Dr. Goldman, plaintiff reported having only five to six seizures since 2007, with an average of one seizure every two years.  He expressed some concerns about taking his medication, but Dr. Goldman indicated that plaintiff appeared to be tolerating it well.  Neurological exam was unremarkable.  Dr. Goldman instructed plaintiff to continue his Keppra, refrain from driving for a minimum of three months, and take other seizure precautions.  (Tr. at 25.)

Plaintiff followed up with Dr. Goldman in November 2018 and September 2019.  At both appointments, he reported being compliant with his medication and having no seizures.  At the November 2018 follow-up, plaintiff reported feeling tired, having difficulty getting out of bed, having an altered appetite, feeling a bit sad, and having little ambition.  Dr. Goldman expressed concern for depression and referred plaintiff to behavioral health services.  Although plaintiff attributed these symptoms to Keppra, Dr. Goldman found no clear evidence that Keppra was responsible for plaintiff's behavioral changes.  At the September 2019 follow up, Dr. Goldman noted that plaintiff had seen behavioral health providers only twice and did not follow through with therapy as recommended.  Plaintiff continued to be seizure free but reported some

symptoms of depression, including fatigue and memory difficulties. Because plaintiff continued to attribute his symptoms to Keppra, Dr. Goldman began the process of switching to Dilantin. However, Dr. Goldman also noted that if plaintiff did not notice any change with a different anti-convulsant, the next step would likely be an antidepressant medication. (Tr. at 26.)

Plaintiff followed up with Dr. Goldman in October 2019, reporting no change in his depressive symptoms, which led Dr. Goldman to conclude that it was not a side effect of Keppra. Plaintiff reported continuing symptoms of depression, including low energy and difficulty accomplishing everyday tasks. He elected to stay on Dilantin. Dr. Goldman increased the dose and also instructed him to get out more, be more active, and follow up with behavioral health. Plaintiff returned to Dr. Goldman in December 2019, reporting that he occasionally shakes when sleeping but had no further seizures. Dr. Goldman stressed the importance of continuing seizure medications and to follow up with behavioral health, informing plaintiff that most people with seizures are able to go back to work, have families, and live relatively normal lives. Dr. Goldman gave plaintiff a letter for court proceedings stating that plaintiff should go back to work one day per week and then progressively increase his time, although he did not offer any explanation for such limitations. Plaintiff telephoned Dr. Goldman in April 2020, requesting another letter for court-related issues, stating that he was still having issues returning to work. Notably, however, Dr. Goldman encouraged plaintiff to try to get back to work in some capacity. (Tr. at 26.)

In July 2020, plaintiff established care with Dr. Arain, reporting that he had experienced four to five seizures since 2009, his last about two years earlier. Plaintiff reported that since switching from Keppra to Dilantin, he had experienced side effects of generalized weakness, sleepiness, difficulty getting up in the morning, poor memory, and mood swings. The ALJ

26

noted that the reports of sleepiness and trouble getting up in the morning were similar to the complaints plaintiff attributed to Keppra and which Dr. Goldman indicated were likely attributable to depression. Neurological and mental status exams were unremarkable, including fluent speech, normal comprehension, no memory deficit, and normal fund of information. (Tr. at 26.) Plaintiff reported that he was seeking disability due to poor quality of life, mostly due to medication side effects, and Dr. Arain switched plaintiff's anticonvulsant to lamotrigine. (Tr. at 27.)

At an August 2020 follow up, plaintiff remained seizure free and denied any side effects from lamotrigine. At a September 2020 follow up, he continued to be seizure free with no significant side effects. Dr. Arain recommended he continue the medication at his current dose, with a plan to increase only if he experienced a breakthrough seizure. (Tr. at 27.)

The ALJ concluded:

Although the claimant has reported experiencing a fear of seizures, the record documents only one seizure since the claimant's alleged onset of disability. The evidence demonstrates that the claimant's seizure disorder is well-controlled with anticonvulsant medication. The above residual functional capacity limits the claimant to jobs requiring no climbing of ladders and no exposure to hazards due to the potential that the claimant could experience a breakthrough seizure. However, no exam findings, treatment notes, or other evidence support any additional physical limitations.

(Tr. at 27.)

With regard to his depression and anxiety, plaintiff consistently reported symptoms to neurologists but had received very little specialized mental health treatment. Dr. Goldman referred plaintiff for behavioral health services in November 2018, and he underwent an initial assessment with Dr. Brown in February 2019. At that time, he reported feeling sad, helpless and worthless, with social withdrawal, irritability, mood swings, increased sleep, anxiety, and

27

some suicidal ideation. Despite his report of symptoms, mental status exam was largely unremarkable other than depressed mood. He maintained good eye contact and displayed unremarkable mannerisms, with congruent thought processes, normal thought content, no perceptual problems, clear and articulate speech, fair insight and judgment, good recent and remote memory, good attention and concentration, and an open level of engagement. He was emotional and cried when discussing how seizures impacted him, and Dr. Brown recommended he consider a higher level of psychological services and medication management. Plaintiff returned to Dr. Brown later that month and decided not to pursue an intensive outpatient program because he wanted to focus on spending time with his children and looking for a job. Despite this being only their second session, Dr. Brown noted plaintiff displayed future-oriented and more positive thoughts. Plaintiff and Dr. Brown set treatment goals, and plaintiff indicated his plans to update his resume, apply for jobs, and spend more time with his children. (Tr. at 27.)

Plaintiff was scheduled to return to Dr. Brown two weeks later but never returned and was discharged from her practice. Dr. Goldman continued to stress the importance of seeking behavioral health, and plaintiff did begin taking Sertraline for anxiety and depression. In October 2019, plaintiff established care with internal medicine physician Dr. Wall, reporting that Sertraline was somewhat effective but that he was interested in seeing a psychiatrist. However, he did not do so, instead continuing to have Dr. Wall prescribe Sertraline. (Tr. at 27.)

Plaintiff ultimately did establish with therapist Vanessa Minor. During a May 2020 session, plaintiff reported that sleep disruption had been causing him to feel more grouchy than usual, but plaintiff was open and talkative during the session and appeared engaged and open to feedback. By August 2020, plaintiff reported that staying busy was helping with his mood

and that he was spending time with his family, riding his bike, doing yard work, and cleaning. During a September 2020 session, plaintiff and Minor discussed strategies for managing plaintiff's mood as the weather turned colder and normal coping mechanisms may not be available. Mental status exam showed plaintiff to be alert and fully oriented with calm and cooperative presentation, calm mood with congruent affect, normal speech, unremarkable motor activity, future-oriented and goal-directed thought processes, and no suicidal ideation. (Tr. at 28.) The ALJ concluded:

> Overall, the treatment notes document some symptoms of depression and anxiety that could be expected to cause moderate limitations in the claimant's ability to perform work tasks and interact with others, but nothing in the treatment notes indicates he would be incapable of performing simple tasks in an environment with limited stressors and limited social interaction.

(Tr. at 28.)

The ALJ then turned to the medical opinions. The agency medical consultants, Drs. Khorshidi and Young, found that plaintiff had no significant exertional limitations but could frequently climb ladders, ropes or scaffolds and must avoid concentrated exposure to hazards. The ALJ found these opinions somewhat persuasive because they were supported by the record documenting normal physical findings and good response to anticonvulsant medications. However, the ALJ concluded that the safety risk posed by the potential for a breakthrough seizure warranted precluding plaintiff from all climbing of ladders, ropes, or scaffolds and all exposure to hazards. (Tr. at 28.)

> Consultative examiner Mark Pushkash, Ph.D., stated in January 2020 that the claimant has the intellectual capacities to comprehend, recall, and follow through on basic instructions but that his ability to concentrate and persist on tasks in a work setting would be markedly impaired due to the interfering effects of depression and anxiety. Dr. Pushkash further stated the claimant might also have some difficulties relating appropriately to supervisors and coworkers due to his low tolerance for frustration and irritability. Finally, Dr. Pushkash stated that

29

the claimant's coping skills are compromised by his seizure disorder and depression. The undersigned finds Dr. Pushkash's opinion somewhat persuasive but concludes that the finding of marked limitations in concentrating and persisting on tasks is not supported by Dr. Pushkash's own exam findings or other evidence of record. Dr. Pushkash noted the claimant performed adequately on memory testing, a serial 7s task, questions of abstract reasoning, and comprehension, and the claimant was able to pay attention during the interview, with no signs of distractibility. Further, Dr. Pushkash did not define the degree of limitation the claimant would have in coping skills, nor did he explain how the claimant's coping skills are limited by his seizure disorder. The undersigned notes that Dr. Pushkash's mental status findings were largely unremarkable, and the above residual functional capacity accounts for the claimant's subjective complaints in light of normal mental status findings.

(Tr. at 28-29, record citations omitted.)

Agency psychological consultant Dr. Bard found that plaintiff would have breaks in his concentration but would be able to reorient himself to complete assigned tasks within acceptable standards and would do best in a position that does not require frequently changing tasks but rather had a fairly regular set of duties. The ALJ found this opinion partially persuasive because it was well-supported by the limited treatment notes, but the ALJ was further persuaded by the finding of psychological consultant Kocina. Dr. Kocina found the same limitations as Dr. Bard but further explained that plaintiff can understand, remember, and carry out simple instructions and would do best in an environment with more limited social interactions. The ALJ noted that Dr. Kocina did not express plaintiff's social limitations in vocationally relevant terms, and the RFC therefore clarified that plaintiff was limited to occasional interaction with coworkers, supervisors, and the public. (Tr. at 29.)

At step four, the ALJ found that plaintiff could not perform his past relevant work as a teacher, a skilled job. (Tr. at 29.) However, at step five, the ALJ found that plaintiff could perform other jobs, as identified by the VE, including food preparer, dishwasher, and vehicle cleaner. (Tr. at 30.) The ALJ accordingly found plaintiff not disabled. (Tr. at 30-31.)

30

### III. DISCUSSION

**A.    CPP**

**1.    Legal Standards**

The Seventh Circuit has held that both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record, including even moderate limitations in concentration, persistence, or pace. Crump v. Saul, 932 F.3d 567, 570 (7th Cir. 2019); Yurt v. Colvin, 758 F.3d 850, 857 (7th Cir. 2014). The court of appeals has further held that an ALJ generally may not rely on catch-all terms like "simple, repetitive tasks" to capture moderate CPP limitations; this is so because observing that a person can perform simple and repetitive tasks says nothing about whether he can do so at an acceptable pace and on a sustained basis. Crump, 932 F.3d at 570; see also Yurt, 758 F.3d at 858-59 ("[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.").

On the other hand, the law does not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work. Martin v. Saul, 950 F.3d 369, 374 (7th Cir. 2020). The Seventh Circuit has affirmed where the ALJ explained how an alternately phrased RFC accounted for each of the claimant's CPP limitations, see, e.g., Martin, 950 F.3d at 374; see also Chojnacki v. Saul, No. 19-cv-432-wmc, 2020 U.S. Dist. LEXIS 66955, at *10 (W.D. Wis. Apr. 16, 2020) (noting that the ALJ in Martin "showed her work" and specifically addressed all three components of CPP); where the CPP limitations were context or task specific, and the RFC restricted the claimant from situations likely to trigger the

31

symptoms, see, e.g., Jozefyk v. Berryhill, 923 F.3d 492, 498 (7th Cir. 2019); and where the ALJ reasonably relied upon the narrative opinion of a medical expert who adequately accounted for any CPP deficits in assessing the claimant's work capacity, see, e.g., Pavlicek v. Saul, 994 F.3d 777, 783-84 (7th Cir. 2021); Burmester v. Berryhill, 920 F.3d 507, 511 (7th Cir. 2019). The court of appeals has also recognized that a "moderate" limitation does not mean the claimant is unable to function in the relevant area; rather, the regulations state that a moderate limitation means that functioning in that area is "fair." Pavlicek, 994 F.3d at 783. Finally, in some cases, any error in addressing CPP limitations may be harmless, e.g., where the claimant identifies no "evidence-based restrictions that the ALJ could include in a revised RFC finding on remand." Jozefyk, 923 F.3d at 498.

### 2. Plaintiff's Argument

Plaintiff indicates that the ALJ found a moderate limitation in CPP at step three; therefore, corresponding limitations needed to be included in the hypothetical and the RFC. See SSR 96-8p, 1996 SSR LEXIS 5, at *13 ("The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF."). The ALJ found that: "[Plaintiff] is limited to simple, routine, and repetitive tasks; limited to jobs with simple decision making and no more than occasional changes; and limited to occasional interaction with supervisors, coworkers, and the public." (Tr. at 24; see also Tr. at 56, matching hypothetical.) Plaintiff argues that these limitations failed to address concentration, persistence, or pace. (Pl.'s Br. at 12-14.)

Plaintiff relies on Listing 12.00, which provides:

32

*Concentrate, persist, or maintain pace (paragraph B3).* This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E)(3). The ALJ included no limitations corresponding to these examples. (Pl.'s Br. at 15.)

Plaintiff further notes that the Seventh Circuit has rejected RFC formulations similar to the ALJ's assessment here. See Winsted v. Berryhill, 923 F.3d 472, 476 (7th Cir. 2019) ("limited to 'simple, routine, repetitive tasks with few workplace changes, no team work, and no interaction with the public'"); Varga v. Colvin, 794 F.3d 809, 813 (7th Cir. 2015) ("limited to simple, routine, and repetitive tasks in a work environment free of fast paced production requirements, involving only simple, work-related decisions with few if any work place [sic] changes."). And unlike in Martin, plaintiff contends that the ALJ here did not explain how the RFC limitations addressed plaintiff's deficits in CPP. (Pl.'s Br. at 18-20.)

Finally, plaintiff contends that the ALJ did not rely on the agency psychological consultants, who found no limitations in CPP. Dr. Pushkash found that plaintiff would have a marked limitation in his ability to concentrate and persist, but the "ALJ rejected Dr. Pushkash's findings of marked limitation, thus indicating that the ALJ had no medical opinion upon which to rely." (Pl.'s Br. at 20.)

### 3.    Analysis

Claimants making CPP arguments typically rely on the "moderate" limitations

33

recommended by agency psychological consultants in the RFC section of the standardized forms they complete.  See, e.g., DeCamp v. Berryhill, 916 F.3d 671, 676 (7th Cir. 2019); Varga, 794 F.3d at 816; Yurt, 758 F.3d at 859; Stobbe v. Kijakazi, No. 20-C-777, 2021 U.S. Dist. LEXIS 148493, at *63 (E.D. Wis. Aug. 9, 2021); Hoeppner v. Berryhill, 399 F. Supp. 3d 771, 777-78 (E.D. Wis. 2019).  In the present case, Dr. Bard found mild limitation in CPP (Tr. at 67), while Dr. Kocina found no limitation (Tr. at 119).  Thus, neither consultant went on to address the various sub-categories in the RFC section, e.g., maintaining attention and concentration for extended periods, completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods.[1]  See Turner v. Saul, No. 20-C-998, 2021 U.S. Dist. LEXIS 98305, at *26 (E.D. Wis. May 25, 2021).  Accordingly, plaintiff cannot point to moderate findings in these areas as evidence of additional limitations that should have been included or otherwise taken into account in the RFC/hypothetical.

True, the ALJ declined to adopt the consultants' CPP findings at step three, stating that plaintiff's "depression and anxiety symptoms could reasonably be expected to cause moderate limitations in this area of functioning."  (Tr. at 23.)  However, an ALJ's finding of a "moderate" CPP limitation at step three does not necessarily mean he is required to include any particular limitation(s) in the RFC, much less find the claimant disabled.  See Stobbe, 2021 U.S. Dist. LEXIS 148493, at *64.  After all, a "'moderate limitation' is defined by regulation to mean that functioning in that area is 'fair.'"  Pavlicek, 994 F.3d at 783.  And since "fair" does not mean "bad" or "inadequate," a "moderate" limitation may be consistent with the ability to perform

---

[1]As plaintiff notes in reply, these mental abilities are also set forth in POMS DI 25020.010(B)(2).  (Pl.'s Rep. Br. at 6-7.)

simple, repetitive tasks at an acceptable pace.  Id.

When the ALJ got to the RFC portion of his decision here, he did credit the consultants'

relevant findings:

> State agency psychological consultant Catherine Bard, Psy.D., found the claimant would have breaks in his concentration but would be able to reorient himself to complete assigned tasks within acceptable standards and would do best in a position that does not require frequently changing tasks but rather had a fairly regular set of duties.  The undersigned finds this opinion partially persuasive because it is well-supported by the limited treatment notes, but the undersigned is further persuaded by the finding of State agency psychological consultant Jason Kocina, Psy.D.  Dr. Kocina found the same limitations as Dr. Bard but further explained that the claimant can understand, remember, and carry out simple instructions and would do best in an environment with more limited social interactions.

(Tr. at 29, internal record citations omitted.)[2]

This case is thus similar to Burmester, in which the ALJ credited the narrative statement

of an agency consultant that the claimant's limitations in concentration and attention were

"manageable," then adopted an RFC virtually identical to the one at issue in this case.  920

F.3d at 511 ("limited to simple, routine, repetitive tasks which would require only simple

work-related decision making and would require few changes in the routine work setting with

no more than occasional interaction with supervisors, coworkers, and the general public").  In

affirming, the Seventh Circuit held: "The ALJ appropriately relied on the narrative statement in

crafting the hypothetical to the vocation[al] expert and the RFC."  Id.  The Seventh Circuit

distinguished DeCamp, a case in which the ALJ failed to account for "moderate" limitations in

the checkbox section of a consultant's report.  "Here, there was no such checkbox indicating

---

[2]Plaintiff notes that the ALJ found a moderate limitation in CPP at step three without any medical opinion supporting that finding.  However, as plaintiff acknowledges in reply, the ALJ was allowed to evaluate all the evidence in making this finding.  (Pl.'s Rep. Br. at 11.)  And as discussed in the text, the ALJ did credit the consultants' reports in determining RFC.

35

a moderate limitation, there was only the Statement of Work Capacity indicating that concentrating at work would be manageable for Burmester." Id. at 512. The same is true in the present case.

Aside from Dr. Pushkash's report, which the ALJ discounted,[3] plaintiff points to no medical evidence supporting greater CPP-related limitations than the ALJ imposed. See Recha v. Saul, 843 Fed. Appx. 1, 5 (7th Cir. 2021) ("Recha has not provided any other credible medical evidence indicating that his symptoms required additional RFC restrictions to account for CPP limitations beyond those included in the ALJ's decision."); Lockett v. Saul, 834 Fed. Appx. 236, 239 (7th Cir. 2020) ("Lockett cannot show a need for pace-specific restrictions in his residual functional capacity simply because of the 'moderate' designation; he must have evidence of that need, and he cites none.").

Moreover, the ALJ cited substantial evidence suggesting plaintiff could handle the type of work reflected in the RFC.[4] While plaintiff reported depressive symptoms to his treating neurologists, he received limited specialized mental health treatment. (Tr. at 27.) When he saw Dr. Brown for a behavioral health assessment in February 2019, he reported depressive symptoms, but his mental status exam was largely unremarkable other than a depressed mood; he displayed good recent memory, remote memory, concentration, and attention. (Tr. at 27, 380.) When he returned for his second session two weeks later, plaintiff reported that

_____

[3]I discuss below plaintiff's challenge to the ALJ's evaluation of Dr. Pushkash's opinion.

[4]The ALJ also acknowledged that the paragraph B criteria are not an RFC assessment but rather are used to rate the severity of mental impairments at steps two and three of the sequential evaluation process, and that the mental RFC assessment used at steps four and five requires a more detailed assessment of the areas of mental functioning. (Tr. at 24.) He thus complied with the portion of SSR 96-8p plaintiff cites. (See Pl.'s Br. at 13.)

36

his mood had improved and his anxiety decreased, and Dr. Brown noted that plaintiff displayed future-oriented and more positive thoughts. (Tr. at 27, 384.) Plaintiff declined an intensive out-patient program, indicating that he planned to update his resume, begin applying for jobs, and spend more time with his children. (Tr. at 27, 384.) He did not return to Dr. Brown for further treatment, and she discharged him from her care. (Tr. at 27, 382.)

The ALJ noted that plaintiff took Sertraline for a time, prescribed by his internal medicine physician, Dr. Wall, but he never saw a psychiatrist for medication management. (Tr. at 27, 421-24.) He ultimately did establish care with a therapist, Vanessa Minor, but her notes also failed to support significant limitations. In May 2020, plaintiff reported feeling grouchy due to sleep disruption, but he appeared open and talkative during the session, open to feedback. (Tr. at 28, 478.) In August 2020, plaintiff reported improved mood, trying to stay busy by spending time with his family, riding his bike, doing yard work, and cleaning. (Tr. at 28, 489.) In September 2020, they discussed strategies for when the weather turned colder, and mental status exam showed plaintiff to be alert and oriented, calm and cooperative, with normal speech, unremarkable motor activity, and future oriented and goal directed thought processes. (Tr. at 28, 485.) The ALJ concluded that while plaintiff experienced depressed and anxious mood at times, "nothing in the treatment notes indicates he would be incapable of performing simple tasks in an environment with limited stressors and limited social interaction."[5] (Tr. at 28.)

As the Commissioner notes, "Plaintiff offers no other evidence in support of his argument that the ALJ was obligated to include greater limitations in the RFC assessment, nor

_____

[5]The ALJ also noted that plaintiff displayed no difficulties with concentration and attention during the consultative exam with Dr. Pushkash. (Tr. at 28.)

does he point to any evidence the ALJ overlooked." (Def.'s Br. at 24.)[6] Instead, plaintiff faults

the ALJ for failing to discuss the examples in Listing 12.03(E)(3). As the Listing itself indicates,

however, documentation of each example is not required. 20 C.F.R. Pt. 404, Subpt. P, App.

1, § 12.00(E)(3). And the ALJ's RFC addressed several of the areas referenced in the Listing,

i.e., limiting the complexity of the tasks plaintiff could do ("initiating and performing a task that

you understand and know how to do"), limiting his interaction with others ("ignoring or avoiding

distractions while working"), and limiting workplace changes ("changing activities or work

settings without being disruptive"). In reply, plaintiff complains that the ALJ failed to offer a

supporting rationale as to how the RFC addressed these areas of functioning (Pl.'s Rep. Br.

at 10), but given the lack of evidence supporting greater limitations it is unclear what more

needed to be said.

Finally, while plaintiff cites cases disapproving RFC assessments like the one used here,

there is no rule requiring "ALJs to use certain words, or to refrain from using others, to describe

the pace at which a claimant is able to work." Martin, 950 F.3d at 374. "Depending on the

nature of the claimant's impairments, a limitation to simple and repetitive tasks may be all that

is necessary. It is the plaintiff's obligation to show that a limitation to simple, routine tasks did

not adequately account for her moderate limitation in concentration, persistence, and pace."

---

[6]In a footnote, plaintiff states: "Considering [that] Dr. Pushkash's findings were based upon Green's depression and anxiety, the finding would support marked limitations in pace as well. Considering that Green testified that he stopped substitute teaching due to his depression and seizures, R47, and that he testified that the depression made it difficult to concentrate, R52, and would leave him angry, such limitations would tend to be justified." (Pl.'s Br. at 20 n.3.) The ALJ was not required to accept plaintiff's subjective contentions. Plaintiff makes no argument that the ALJ erred in finding his statements "not entirely consistent" with the evidence of record. See Wilder v. Kijakazi, 22 F.4th 644, 653 (7th Cir. 2022) ("This Court will uphold an ALJ's credibility determination unless that determination is 'patently wrong.'").

38

Tanya C. v. Kijakazi, No. 20-CV-958, 2021 U.S. Dist. LEXIS 232622, at *17 (E.D. Wis. Dec. 6, 2021); see also Saunders v. Saul, 777 Fed. Appx. 821, 825 (7th Cir. 2019) ("Saunders never once has told this court what other restrictions the ALJ should have included in her hypothetical, nor even at oral argument could he suggest a better way to capture the idea behind limitations in concentration, persistence, and pace and apply those problems to job requirements."); Jozefyk, 923 F.3d at 498 (noting that generic limitations will suffice "when they adequately account for the claimant's demonstrated psychological symptoms").  In reply, plaintiff faults the Commissioner for failing to address Winsted and other CPP cases he cited. (Pl.'s Rep. Br. at 10.)  However, plaintiff does not address Saunders or Tanya C., cited by the Commissioner in response, which hold that in some cases a "generic" RFC can suffice.

Plaintiff also argues in reply that the ALJ's RFC was internally inconsistent, failing to address the ALJ's own finding at step three.  (Pl.'s Rep. Br. at 6, 9-10.)  As discussed above, there is no rule requiring the ALJ to include any particular limitations in the RFC whenever he finds a moderate limitation at step three.

Plaintiff contends that in making his step three finding the ALJ noted that plaintiff needed encouragement from family to complete tasks, lacked concentration, and experienced low energy and low motivation.  (Pl.'s Rep. Br. at 6, citing Tr. at 23.)  Plaintiff then links these subjective complaints to three of the functions set forth in Listing 12.00(E)(3): "completing tasks in a timely manner"; "working at an appropriate and consistent pace"; and "working a full day without needing more than the allotted number or length of rest periods during the day."  (Pl.'s Rep. Br. at 6.)  The ALJ was in the cited portion of his decision summarizing plaintiff's pre-hearing reports and complaints to providers; he made no specific finding on the credibility of these assertions.  (Tr. at 23.)  Later, in the RFC section of his decision, the ALJ more

39

specifically discussed the credibility of these assertions, finding them not entirely consistent with the medical and other evidence of record. (Tr. at 25.) And as indicated in note 6, supra, plaintiff makes no argument that the ALJ's credibility determination was "patently wrong."

Plaintiff further argues that the ALJ was required to discuss the basic mental demands of work referenced in POMS DI 25020.010. (Pl.'s Rep. Br. at 6-7.) As discussed in note 1, supra, and the attached text, the record contains no specific evidence of limitation corresponding to these functions. Plaintiff cites no authority requiring the ALJ to explain why he excluded limitations for which there was no evidence. Plaintiff later argues in reply that the ALJ ignored an entire line of evidence when he failed to address the POMS work demands. (Pl.'s Rep. Br. at 11-12.) "This is even more true when it was the ALJ who provided the entire line of evidence." (Pl.'s Rep. Br. at 12.) It is unclear how the ALJ provided any evidence when he made a finding of moderate limitation in CPP at step three. As indicated, at step three, the ALJ acknowledged the subjective complaints plaintiff made to providers and in his pre-hearing reports (Tr. at 23), but in determining RFC the ALJ found these statements not entirely consistent with the evidence of record and concluded that the overall record supported the RFC finding.

## B.    Consultative Examiner Pushkash

### 1.    Legal Standards

Under the regulation applicable to this claim, an ALJ is not required to defer or give any specific evidentiary weight to any medical opinion or prior administrative medical finding, including those from the claimant's treating providers. 20 CF.R. § 404.1520c(a). Rather, the ALJ determines how persuasive the opinions are, with the most important factors being the

40

"supportability" and "consistency" of the opinion. Id. The ALJ may also consider other factors, including the length, nature, and extent of the source's relationship with the claimant; the source's specialization, if any; and other factors, such as the source's familiarity with the other evidence of record or an understanding of the disability program's policies and evidentiary requirements. Id. § 404.1520c(c)(3)-(5).

### 2. Plaintiff's Argument

As indicated above, Dr. Pushkash opined that plaintiff's ability to concentrate and persist on tasks in a work setting would be markedly impaired due to the interfering effects of depression and anxiety. He further concluded that plaintiff might have some difficulties relating appropriately to supervisors and coworkers because he has a low tolerance for frustration and is easily irritated. "Coping skills are compromised by his seizure disorder and his depression." (Tr. at 437-38.)

The ALJ found Dr. Pushkash's opinion "somewhat persuasive" but rejected the finding marked limitation in concentrating and persisting on tasks as "not supported by Dr. Pushkash's own exam findings or other evidence of record." (Tr. at 28.) In support of this finding, the ALJ cited plaintiff's performance on testing and his comportment during the evaluation. (Tr. at 28.) The ALJ further noted that Dr. Pushkash did not define the degree of limitation plaintiff would have in coping skills, nor did he explain how plaintiff's coping skills were limited by his seizure disorder. (Tr. at 28-29.) Finally, the ALJ noted that Dr. Pushkash's mental status findings were largely unremarkable, and that the RFC he adopted accounted for plaintiff's subjective complaints in light of normal mental status findings. (Tr. at 29.)

Plaintiff argues that the ALJ's rejection of the CPP limitation was not supported by substantial evidence. He further argues that the ALJ did not explain how a limitation to

41

occasional interaction with others would adequately address low tolerance for frustration and irritation. (Pl.'s Br. at 21.) I address each argument in turn.

### 3. Analysis

#### a. CPP

Plaintiff alleges two problems with the ALJ's evaluation of Dr. Pushkash's CPP finding. First, plaintiff takes issue with the ALJ's reliance on Dr. Pushkash's test results, noting that the memory testing occurred on one day and thus provides little support for a longitudinal finding. See Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011) ("[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition."). Plaintiff contends that the fact that he had good memory on one day did not mean he did not have memory problems on other days. (Pl.'s Br. at 21.)

The ALJ stood on solid ground in discounting Dr. Pushkash's opinion based in part on the lack of support in the doctor's own test results. See Loveless v. Colvin, 810 F.3d 502, 507 (7th Cir. 2016); Henke v. Astrue, 498 Fed. Appx. 636, 640 (7th Cir. 2012); Cotton v. Kijakazi, No. 21-C-658, 2022 U.S. Dist. LEXIS 85264, at *40 (E.D. Wis. May 10, 2022). Since Dr. Pushkash saw plaintiff for a consultative evaluation, his testing was necessary limited to that day. But the ALJ did not stop there; he also considered the other evidence of record, which documented good memory on other occasions. (E.g., Tr. at 26, 559; 27, 380.) Plaintiff faults the ALJ for relying on Dr. Pushkash's memory testing, but he cites no medical evidence of his own demonstrating memory problems. See Karr v. Saul, 989 F.3d 508, 513 (7th Cir. 2021) ("Karr bears the burden of proving that she is disabled. She failed to carry that burden by not identifying any objective evidence in the record corroborating Dr. Canavati's statement.")

42

(internal citations omitted).

Plaintiff notes that test results obtained in the safe confines of a doctor's office do not necessary transfer to the work environment. (Pl.'s Br. at 22.) However, plaintiff fails to explain how this demonstrates error in his case. The ALJ cited findings from examinations with other providers, in addition to the reports of Drs. Bard and Kocina, in reaching his conclusion.

Plaintiff argues that the ALJ should have considered the general consistency of the marked limitation with the other evidence of record. (Pl.'s Br. at 22-23; Pl.'s Rep. Br. at 12.) He cites Dr. Bard's finding that he would have "breaks in his concentration" (Tr. at 89); Dr. Goldman's notation of "lack of ambition, difficulty returning to work and depression" (Tr. at 362); and Dr. Brown's diagnoses of "Depression secondary to his medical condition (epilepsy)" and "adjustment disorder with anxious mood" (Tr. at 381). The ALJ did consider this evidence. (Tr. at 29, Dr. Bard; Tr. at 26, Dr. Goldman; Tr. at 27, Dr. Brown.) Moreover, plaintiff fails to explain how any of it supports Dr. Pushkash's finding of marked limitation in CPP. Dr. Bard found a mild limitation in this area (Tr. at 83) and later explained that despite breaks in his concentration plaintiff would be able to reorient himself to complete assigned tasks within acceptable standards (Tr. at 89). These findings are not consistent with Dr. Pushkash's "marked" limitation. For his part, Dr. Goldman pushed back against plaintiff's contention that he could not return to work, noting that most people with seizures lead productive lives, and encouraging him to try to get back to work in some capacity.[7] (Tr. at 26, 479.) And Dr. Brown's diagnoses of depression and adjustment disorder did not require the ALJ to include any specific limitations in the RFC, see Skinner v. Astrue, 478 F.3d 836, 845 (7th Cir. 2007) ("[T]he

_____

[7]The record shows that plaintiff decided to seek another neurologist "because Dr. Goldman was not encouraging his desire for disability." (Tr. at 558.)

43

existence of these diagnoses and symptoms does not mean the ALJ was required to find that Skinner suffered disabling impairments."), particularly given Dr. Brown's "largely unremarkable" mental status examination. (Tr. at 27, 380.)

Plaintiff also argues that the ALJ failed to consider Dr. Pushkash's examining relationship when assessing supportability and consistency. (Pl.'s Br. at 23.) The regulation specifically states that ALJs "may, but are not required to, explain how [they] considered" the source's relationship with the claimant. 20 C.F.R. § 404.1520c(b)(2); see Albert v. Kijakazi, No. 21-2592, 2022 U.S. App. LEXIS 13379, at *6 (7th Cir. May 18, 2022) ("Under these new regulations, a doctor's 'relationship with the claimant' only 'may help' in assessing an opinion's persuasiveness. And an ALJ 'may, but [is] not required to, explain how [she] considered' these factors in explaining her ultimate reliance on a medical opinion.") (internal citations omitted). In any event, the ALJ acknowledged that Dr. Pushkash conducted a consultative examination. (Tr. at 22.)

Second, plaintiff notes that a psychological opinion may rest either on testing or on the source's observations during the exam. (Pl.'s Br. at 23.) Here, in addition to testing, Dr. Pushkash completed a mental status examination. Plaintiff notes that mental health professionals are trained to make observations about the subject's behavior, speech, and mannerisms during such examinations, which may inform their opinions. (Pl.'s Br. at 24.) Here, Dr. Pushkash considered plaintiff's mental health "through the objective lens of [his] professional expertise." (Pl.'s Br. at 25, quoting Mischler v. Berryhill, 766 Fed. Appx. 369, 375 (7th Cir. 2019).)

The ALJ noted that Dr. Pushkash's "mental status findings were largely unremarkable" (Tr. at 29), and plaintiff points to no observations documented in Dr. Pushkash's report

44

supporting his finding of a marked limitation in CPP.  Under the regulation, "The more relevant

the objective medical evidence and supporting explanations presented by a medical source are

to support his or her medical opinion(s) or prior administrative medical finding(s), the more

persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R.

§ 404.1520c(c)(1).  Here, Dr. Pushkash cited no evidence and provided no explanation for this

significant limitation.  Plaintiff's general appeal to the doctor's expertise cannot fill in this gap

in the report.

The ALJ also found Dr. Pushkash's finding on this point inconsistent with the other

evidence of record.  (Tr. at 28.)  Again, under the regulation, "The more consistent a medical

opinion(s) or prior administrative medical finding(s) is with the evidence from other medical

sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or

prior administrative medical finding(s) will be."  20 C.F.R.  § 404.1520c(c)(2).  Earlier in his

decision, the ALJ explained how the treatment notes supported a finding that plaintiff could

perform simple tasks in an environment with limited stressors and limited social interaction (Tr.

at 28),[8] and in the following section he credited the opinions of the agency psychological

consultants.  To the extent plaintiff may be arguing the ALJ was required to specifically discuss

consistency within one section of his decision (see Pl.'s Rep. Br. at 13-14), he overlooks the

rule that ALJ decisions are read as a whole.  Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir.

─────────────────────

[8]In reply, plaintiff cites occasions on which he complained of depression, anxiety, and memory issues.  (Pl.'s Rep. Br. at 14.)  The ALJ discussed most of this evidence.  (Tr. at 26 ¶ 2, Dr. Goldman's September 2019 note; Tr. at 26 ¶ 3, Dr. Arain's July 2020 note; Tr. at 27 ¶ 3, Dr. Brown's February 2019 notes; Tr. at 28, Dr. Pushkash's evaluation.)  Moreover, the cited evidence consists primarily of plaintiff's subjective complaints.  The ALJ accepted that these reported symptoms would be expected to cause some limitation on plaintiff's ability to perform work tasks and interact with others (Tr. at 28), but he rejected as inconsistent with the record plaintiff's allegation of disabling limitations (Tr. at 25, 28, 29).

45

2015); see Buckhanon ex rel. J.H. v. Astrue, 368 Fed. Appx. 674, 678-79 (7th Cir. 2010) ("There is no requirement of such tidy packaging, however; we read the ALJ's decision as a whole and with common sense.").

### b. Interaction with Others

Plaintiff argues that the ALJ also erred by failing to articulate any support for the occasional limitation in dealing with others. Dr. Pushkash noted a low tolerance for frustration and irritation, which, plaintiff contends, would likely impact how the interaction occurred, not how often it took place. (Pl.'s Br. at 25.) Plaintiff relies on cases distinguishing between the "quantity" of time spent with others and the "quality" of the interactions. See Wartak v. Colvin, No. 2:14-CV-401-PRC, 2016 U.S. Dist. LEXIS 29237, at *18 (N.D. Ind. Mar. 8, 2016).

The Seventh Circuit has not been receptive to this argument. See Reynolds v. Kijakazi, 25 F.4th 470, 475 n.3 (7th Cir. 2022) ("Wartak does not cite case law or regulations in support of this distinction[.]"). In cases where no doctor recommended only "superficial" interactions, the ALJ is not required to intuit a qualitative limitation from general evidence of difficulty getting along with others. Id. at 473-74. That is all the record shows here. Dr. Pushkash never said that plaintiff's frustration and irritation would impact the quality of his interactions, and plaintiff cites no other evidence supporting a qualitative limitation. Accordingly, the "ALJ was not required to impose such a limitation in the RFC, much less explain [his] decision not to." Id. at 474.

The ALJ reasonably relied on Dr. Kocina's finding that plaintiff would have some difficulty being around other people for extended periods of time and would do best in an environment with more limited social interactions. (Tr. at 108.) Translating this finding into vocationally relevant terms, the ALJ included a limitation of occasional interaction with

46

coworkers, supervisors, and the public. (Tr. at 29.) Plaintiff cites no evidence compelling a more significant social limitation. See Gedatus v. Saul, 994 F.3d 893, 900 (7th Cir. 2021) ("We will reverse only if the record compels a contrary result.") (internal quote marks omitted).

In reply, plaintiff abandons the qualitative/quantitative argument. He instead contrasts the pertinent findings from Drs. Kocina and Pushkash, and argues that the ALJ failed to explain how he reached the limitation to occasional contact. (Pl.'s Rep. Br. at 15.) The ALJ noted that Dr. Pushkash "did not define the degree of limitation the claimant would have in coping skills, nor did he explain how the claimant's coping skills are limited by his seizure disorder." (Tr. at 28-29.) He then endorsed Dr. Kocina's opinion on the issue, reasonably translating the consultant's finding that plaintiff would have some difficulty being around other people for extended periods of time into a limitation for occasional contact with others. (Tr. at 29.) The ALJ provided an adequate explanation. See Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008) (holding that the court will uphold an ALJ's decision to discount a physician's opinion so long as the ALJ minimally articulated his reasons).

## C.    Separation of Powers

### 1.    Legal Standards

The Supreme Court has held that, under Article II of the Constitution, the President must have the authority to remove those who wield executive power on his behalf. Seila Law LLC v. Consumer Fin. Prot. Bureau, 140 S. Ct. 2183, 2191-92 (2020) (citing Myers v. United States, 272 U. S. 52 (1926)). In Seila Law, the Court applied this rule in a case involving the Director of the Consumer Financial Protection Bureau ("CFPB"), id. at 2192-93, holding "that the CFPB's leadership by a single individual removable only for inefficiency, neglect, or

47

malfeasance violates the separation of powers."  Id. at 2197.

### 2.    Plaintiff's Argument

The Commissioner of the Social Security Administration, much like the CFPB Director, "may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office."   42 U.S.C. § 902(a)(3).   Plaintiff argues that this, too, violates separation of powers.  (Pl.'s Br. at 29-30.)  And because the agency's ALJs act pursuant to the Commissioner's delegation, plaintiff contends that they are operating without constitutional authority and their disability determinations are therefore null.  (Pl.'s Br. at 31.)

Plaintiff further argues that, if this is deemed insufficient, remand is warranted under the framework established in Collins v. Yellen, 141 S.Ct. 1761 (2021).  In Collins, the Court applied Seila Law in a case involving the Director of the Federal Housing Finance Agency ("FHFA").  Id. at 1783-84.  In addition to demonstrating a violation of the separation powers, the Court noted that the challengers had to show the unconstitutional removal provision caused them compensable harm, remanding so the lower courts could address this issue.  Id. at 1789.

Plaintiff contends that he suffered multiple injuries: (1) he did not receive a constitutionally valid hearing and adjudication from an ALJ; (2) he did not receive a constitutionally valid decision from an ALJ to which he was entitled; (3) he received an unfavorable decision from this constitutionally illicit ALJ adjudication process; (4) he did not receive a constitutionally  valid adjudication process from the Appeals Council to which he was entitled; (5) he did not receive a constitutionally valid determination by the Appeals Council to which he was entitled; and (6) he received an unfavorable determination from this constitutionally illicit Appeals Council adjudication process.  He contends that remand for a new hearing before a new ALJ would redress at least four of these injuries, and that remand to the

48

Appeals Council to conduct a constitutionally valid adjudication process at that level would redress at least two of these injuries.  (Pl.'s Br. at 31-32; Pl.'s Rep. Br. at 19-20.)

### 3.    Analysis

The Commissioner agrees that 42 U.S.C. § 902(a)(3) violates the separation of powers.  (Def.'s Br. at 3.)  But without more, this does not render null and void all unfavorable disability decisions rendered by the agency's ALJs.    In Collins, the Court explained that an unconstitutional removal provision does not strip a properly appointed official of the power to undertake the other responsibilities of his or her office.  140 S. Ct. at 1788 n.23.  "As a result, there is no reason to regard any of the actions taken by the [agency] as void."  Id. at 1787 (emphasis added).    Rather, the challenger must show harm arising from the President's inability to remove the officer at will.  Id. at 1789.

Following this reasoning, district courts across the country have rejected the argument that § 902(a)(3)'s removal restriction requires remand in an individual social security disability case.  (Def.'s Br. at 9, collecting cases.)  The injuries plaintiff asserts here—essentially, that he was subjected to a constitutionally invalid adjudicative process—would apply to every claimant and cannot support a remand order in a specific case.  See, e.g., Vickery v. Comm'r of Soc. Sec., No: 5:21-cv-122-PRL, 2022 U.S. Dist. LEXIS 15181, at *10-11 (M.D. Fla. Jan. 26, 2022); Nathanial H. v. Kijakazi, No. 6:19-cv-01280-AA, 2021 U.S. Dist. LEXIS 239561, at *15-17 (D. Ore. Dec. 15, 2021).

As plaintiff concedes in reply, his argument has been rejected repeatedly by the district courts.  (Pl.'s Rep. Br. at 16-17, collecting cases.)  After the parties filed their briefs, the Ninth Circuit applied Collins in this context, holding that the denial of a social security disability claim need not be deemed void due to the separation of powers violation.  Kaufmann v. Kijakazi, 32

49

F.4th 843, 849 (9th Cir. 2022).  The court further explained:

> A party challenging an agency's past actions must instead show how the unconstitutional removal provision <u>actually harmed</u> the party—for example, if the President would have removed the agency's head but for the provision or, alternatively, if the agency's head "might have altered his behavior in a way that would have benefited" the party.  <u>Id.</u> at 1789.  Claimant therefore must "demonstrat[e] that the unconstitutional provision actually caused [her] harm." <u>Decker Coal Co. v. Pehringer</u>, 8 F.4th 1123, 1137 (9th Cir. 2021) (citing <u>Collins</u>, 141 S. Ct. at 1788-89).  "Absent a showing of harm, we refuse to unwind the decision[] below."  <u>Id.</u>

Claimant has presented neither evidence nor a plausible theory to show that the removal provision caused her any harm.  Claimant does not assert, for example, that the President took an interest in her claim or that the Commissioner directed the Appeals Council to decide her case in a particular way because of the statutory limits on the President's removal authority.  Nothing in the record suggests any link whatsoever between the removal provision and Claimant's case.  <u>See, e.g.</u>, <u>Collins</u>, 141 S. Ct. at 1802 (Kagan, J., concurring in part) (opining that "I doubt the mass of [Social Security Administration] decisions—which would not concern the President at all—would need to be undone" because "[w]hen an agency decision would not capture a President's attention, his removal authority could not make a difference"); <u>Ramos v. Comm'r</u>, No. 1:20-cv-01606-EPG, 2022 WL 105108, at *3-4 (E.D. Cal. Jan. 11, 2022) (collecting cases and concluding that the claimant "has not shown any connection between the denial of benefits and the unconstitutional removal provision").

During oral argument, Claimant asserted that the unconstitutional removal provision affected the "expected value" of Claimant's claim because the Commissioner theoretically could act in more ways than he could have without the removal restriction.  That argument is not particularized to Claimant; if we agreed, then it would require us to undo all disability decisions made by the Social Security Administration while the removal provision was operative.  We reject the argument. As an initial matter, the reasoning is illogical.  Even accepting the questionable premise that the Commissioner might act differently with respect to an individual claimant, the Commissioner just as readily might act in a claimant's favor as in a claimant's disfavor.  So, without some evidence of how the Commissioner was inclined to exercise expanded authority with respect to the particular claimant, we fail to see how even the theoretical "expected value" of Claimant's case would change.  In any event, the argument rests solely on speculation that the Commissioner theoretically might have acted differently. Claimant cannot meet her burden of showing actual harm with speculation alone. <u>Cf.</u> <u>Munns v. Kerry</u>, 782 F.3d 402, 411 (9th Cir. 2015) (holding that speculation cannot satisfy Article III standing requirements).

50

> In sum, we hold that the removal provision in 42 U.S.C. § 902(a)(3) violates separation of powers; that the provision is severable; and that, unless a claimant demonstrates actual harm, the unconstitutional provision has no effect on the claimant's case. Because Claimant has not shown actual harm, we uphold the Commissioner's decision.

Id. at 849-50. I substantially agree with this analysis. Because he has not alleged any particularized harm, plaintiff cannot obtain a remand on this ground.

Finally, plaintiff's argument fails for an additional reason. The ALJ who issued the final decision in this case had his appointment ratified by an Acting Commissioner, who was removable at will by the President. (Def.'s Br. at 3, 5-6.) Thus, the unconstitutional removal restriction had no impact on the ALJ in this particular case. See, e.g., Corissa D.B. v. Comm'r of Soc. Sec., No. 2:21-cv-1816, 2022 U.S. Dist. LEXIS 88311, at *19 (S.D. Ohio May 17, 2022) ("As the Commissioner correctly notes, an Acting Commissioner is not subject to § 902(a)(3)'s removal provision thereby making that provision's constitutionality, or lack thereof, irrelevant."); Baird v. Comm'r of SSA, No. 5:21-CV-00126-DAP, 2022 U.S. Dist. LEXIS 87277, at *26 (N.D. Ohio Apr. 22, 2022) ("Acting Commissioner Berryhill—who ratified the appointment of ALJ Schmitz—was removable at-will and was not subject to § 902(a)(3)'s removal provision."); Williams v. Kijakazi, No. 5:21-cv-6-MOC, 2022 U.S. Dist. LEXIS 47918, at *9 (W.D.N.C. Mar. 17, 2022) ("[T]he ALJ who issued the final decision denying Plaintiff's claim was not appointed by a Commissioner subject to Section 902(a)(3)'s removal restriction. Rather, the ALJ had his appointment ratified by an Acting Commissioner of Social Security—whom the President could have removed from that role at will, at any time. Thus, the removal restriction had no impact on the ALJ's appointment.").[9]

---

[9]Plaintiff relies primarily on Tafoya v. Kijakazi, 551 F. Supp. 3d 1054 (D. Colo. 2021), but "Tafoya only addressed a plaintiff's standing to bring a claim, which requires far less of a

51

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 23rd day of May, 2022.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

---

showing than establishing harm from an unconstitutional provision. See Collins, 141 S. Ct at 1779, 1789 (finding standing but remanding to lower courts to determine whether the unconstitutional removal provision inflicted compensable harm)." Shannon R. v. Comm'r of Soc. Sec., No. C21-5173-MLP, 2021 U.S. Dist. LEXIS 223289, at *20 n.9 (W.D. Wash. Nov. 18, 2021).